UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Ron Dreyer and Nicklaus Dreyer, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 09-1406 |
| | ) | |
| Timmothy Carlton and Michael Luedtke, | ) | |
|     Defendants | ) | |

**ORDER**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the Court is the Defendants' Motion for summary judgment (#52). I have carefully considered the arguments and supporting evidence submitted by the parties. For the reasons stated herein, the Motion is GRANTED IN PART and DENIED IN PART.

**JURISDICTION AND VENUE**

Counts I and III of this case arise under the Constitution and laws of the United States. This Court has original jurisdiction over those claims under 28 U.S.C. 1331.

Counts II and IV are so related to the claims made in Counts I and III that they form part of the same case or controversy under Article III of the Constitution. This Court has supplemental jurisdiction over those claims under 28 U.S.C. 1367.

Venue in this Court is proper, as both Plaintiffs reside within this District, both Defendants are employed within this District, and the events complained of took place within this District.

**SUMMARY JUDGMENT GENERALLY**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary

judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See <u>Jay v. Intermet Wagner Inc.</u>, 233 F.3d 1014, 1016 (7th Cir.2000); <u>Cox v. Acme Health Serv.</u>, 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 922 (7th Cir.1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, <u>Erdman v. City of Ft. Atkinson</u>, 84 F.3d 960, 961 (7th Cir. 1996); <u>Vukadinovich v. Bd. of Sch. Trustees</u>, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); <u>Lohorn v. Michal</u>, 913 F.2d 327, 331 (7th Cir. 1990); <u>DeValk Lincoln-Mercury, Inc. V. Ford Motor Co.,</u> 811 F.2d 326, 329 (7th Cir. 1987); <u>Bartman v. Allis Chalmers Corp.</u>, 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970); <u>Trotter v. Anderson</u>, 417 F.2d 1191 (7th Cir. 1969); <u>Haefling v. United Parcel Serv., Inc.</u>, 169 F.3d 494, 497 (7th Cir.1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. <u>Piscione v. Ernst & Young, L.L.P.</u>, 171 F.3d 527, 532 (7th Cir.1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." <u>McDonald v. Village of Winnetka</u>, 371 F.3d 992, 1001 (7th Cir. 2004). The proper inquiry is whether a rational trier of fact could reasonably find for the party

opposing the motion with respect to the particular issue. See, e.g., Jordan v. Summers, 205 F.3d 337, 342 (7th Cir.2000).

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995), citing Anderson, 477 U.S. at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

A plaintiff may defeat summary judgment with his or her own deposition. Paz v. Wauconda Healthcare and Rehabilitation Centre, 464 F.3d 659, 664 -665 (7th Cir.2006); Williams v. Seniff, 342 F.3d 774, 785 (7th Cir.2003); Payne v. Pauley, 337 F.3d 767, 771-73 (7th Cir. 2003); Winskunas v. Birnbaum, 23 F.3d 1264, 1267 (7th Cir.1994) (plaintiff can present deposition testimony demonstrating the existence of a genuine issue of material fact to ward off the grant of summary judgment).

## FACTS

As is conceded by the Defendants, there are plenty of disputed facts in this case. Defendants assert, however, that their motion has taken the facts in the light most favorable to Plaintiffs and has assumed the Plaintiffs' version of those facts; the disputes are therefore immaterial and do not preclude their entitlement to summary judgment. The following statement of facts, therefore, sometimes notes that there are disputes, but where that is true, the statement of facts and the following discussion both assume the veracity of the Plaintiffs' account.

Ron and Nicklaus Dreyer are brothers; they are Caucasian. They live a few doors away from each other in Bloomington, Illinois. On October 17, 2008, Ron went to a tavern where he drank two

or three 22 ounce draft beers. He then went to another tavern that is located right across the street from his house; he was thrown out of that tavern for some immaterial reason. Two friends, Tabatha Peterson and John Pate, live close by, and they, along with several other people, were attempting to get Ron to go home. They walked him across the street to his yard. Ron wanted to go back to the bar but Tabatha and John kept him walking towards home. They slipped on the wet grass, and Tabatha began tickling Ron for some reason, which caused him to throw up. She and John then got up and walked Ron to his front door. She testified that they were all laughing and that there was no fight or other incident.

Someone had called the police and reported that "some black people were beating up a white male" at the location of Ron's house[1]. Officer Timothy Carlton was dispatched to the area to investigate this report. When he arrived in his squad car, he got out of the car. From this point forward, the incident described by Officer Carlton is very different than the incident described by the Plaintiffs and their witnesses. In order for Defendants to be entitled to judgment, the description of the events as they unfolded must conform to the testimony of the Defendants and the non-police witnesses.

For example, Carlton states that Ron "refused" to comply with his directive to come over and talk to him and that he was belligerent and combative. Ron and others, however, testify that Ron simply replied that he was drunk and was afraid he would fall on the officer and then be charged with battery on a police officer. His "refusal" consisted largely of using loud profanity and taking a step

---

[1] Neither Defendants nor Plaintiff has told the Court the race of any participant or witness other than the Plaintiff's. Tabatha states in her deposition that she is black and John is white. She also testified that the other people assisting Ron from the tavern to his yard included several of her children. There were also neighbors present at some point in time; their race is not known. The significance of the participants' and witness's races is not apparent, other than giving context to the report made to the police department.

backwards when Carlton came towards him. It is not disputed that Carlton threatened Ron with his taser.

When Officer Luedtke arrived, Carlton told him that he was charging Ron with obstructing a peace officer. Luedtke then advised Ron he was under arrest, grabbing his left wrist. Witnesses testified that Luedtke (and other officers who arrived) "rushed" Ron. The witnesses describe how Luedtke pushed Ron up against the garage and knocked him to the ground, and then participated in forcefully handcuffing[2] him.

Similarly, Carlton stated that when Nicklaus arrived on the scene, he "approached" Carlton, intervening on behalf of his brother. Other witnesses testified that Nicklaus argued with Carlton but that it was Carlton who "approached" Nicklaus. All agree that Nicklaus did not resist being handcuffed. After being handcuffed, he did, however, verbally object to being "pulled" by Carlton, who was trying to move towards Ron and Luedtke. When Nicklaus objected, Carlton then admits that he slammed Nicklaus on the ground, causing his face to hit the ground. (Defendants' Statement of Fact, ¶ 30). While Carlton states that he then "briefly" grabbed Nicklaus' neck and pepper sprayed him, Nicklaus states that Carlton grabbed his throat and squeezed as he sprayed him twice in the face.[3]

While these events transpired, a group of neighborhood people were watching. Estimates vary about how many people were there, from 50 (Officer Carlton), to more than 10 (Officer Luedtke), to about 10 (Ron Dreyer).

---

[2]There is also some witness testimony that Ron was "hogtied," which was described as being placed in some sort of leg restraint or hobble.

[3]In their "Argument" section, Defendants state that "Nicklaus was briefly cooperative when he was handcuffed, but not otherwise." This is another example of Defendants failing to view the facts from the Plaintiffs' perspective. The lack of cooperation, as stated by the Plaintiffs, was simply verbal, with no physical element to it.

5

As a result of being thrown to the ground, Nicklaus received a laceration above his right eye (which required stitches) and an abrasion on his right cheek. Ron claims that he suffered pain in his neck, shoulder and chest. Two months after the incident, on Dec. 12, 2008, Ron was seen at the VA Clinic by S. Chacko, MD. The history Ron gave to Dr. Chacko was that a fight with the police in October had caused a lot of pain to his shoulder, neck and chest. He claimed to have fractured his clavicle. The doctor noted "significant crepitation" on Ron's left shoulder, noting that problem again with extended elevated shoulder. He also noted "some tenderness" over the clavicle. X-rays were taken. They showed an "old fracture on the distal third of the clavicle." The doctor's notes stated, "I am not sure how old the fracture is."

## THE PLEADINGS AND MOTION

The two brothers filed this action in the Circuit Court for McLean County, Illinois. Defendants removed the case to this Court. In the Complaint, Ron alleges that Officer Luedtke used excessive force in violation of the Fourth Amendment (Count I) and that he committed battery on him (Count II). Nicklaus alleges that Officer Carlton used excessive force in violation of the Fourth Amendment (Count III) and committed battery on him (Count IV).

In the Answer, Defendants denied the material allegations. In addition, four affirmative defenses were raised. As to the two federal claims in Counts I and III, Defendants assert they are entitled to qualified immunity. As to the state tort claims in Counts II and IV, Defendants assert statutory tort immunity, comparative negligence, and joint and several liability.

Following completion of discovery, Defendants filed the motion for summary judgment now before the Court. Defendants assert that their use of force was reasonable under the circumstances and hence did not violate the Fourth Amendment. They also assert the two forms of immunity raised in their affirmative defenses.

## DISCUSSION

*FEDERAL CLAIMS*

The Supreme Court has emphasized that the "touchstone of the Fourth Amendment is 'reasonableness.'" See, e.g., Brigham City v. Stuart, 547 U.S. 398, 403 (2006). To determine if force used in a particular situation is reasonable, the Court is to balance the nature and quality of the intrusion on individual rights against the countervailing governmental interests at stake. Graham v. Connor, 490 U.S. 386, 395 (1989). Proper application of this balancing test requires not only careful attention to the facts; it also acknowledges that "police officers are often forced to make split-second judgements - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

As the Seventh Circuit has phrased it, the proper inquiry "looks to whether the force used ... was excessive in relation to the danger he posed - to the community or to the arresting officers - if left unattended." Estate of Escobedo v. Bender 600 F.3d 770, 780 (7th Cir. 2010). Viewing the totality of circumstances at the time of the events, the use of force violates the Fourth Amendment if it is greater than necessary to effectuate an arrest. Chelios v. Heavener, 520 F.3d 678, 689 (7th Cir. 2008).

Various cases have identified a number of factors relevant to the totality of the circumstances analysis. Those factors include the severity of any crime involved, whether the person poses an immediate threat to the safety of officers or others, and whether he is resisting arrest or attempting to evade arrest by flight. Graham, 490 U.S. at 397, citing Tennessee v. Garner, 471 U.S. 1, 7-8 (1985). See also, Escobedo. 600 F.3d at 780.

Under the version of facts presented by the Plaintiffs, neither Ron nor Nicklaus had committed any crime at all when Carlton arrived on the scene. In fact, the incident being investigated

indicated that Ron may have been the victim of a crime, rather than a criminal. Under that version of the facts, it is not apparent that there was a need for any force at all, at least not at the outset.

Based on the Plaintiffs' version of these events, there was no immediate threat to anyone - Ron, neighbors, friends, or officers - when Carlton arrived. Ron, who was obviously intoxicated, just wanted to go inside his own house. Tabatha and the others were merely helping him along, and everyone told Carlton that. At that point in time, there was no indication, other than an anonymous report, of any type of problem. Allowing Ron to go inside would have ended the evening without further problems. That did not happen, however, and the situation escalated, resulting in the use of force against and the arrest of the two brothers.

Although Officer Carlton initially interacted with Ron, once Officer Luedtke arrived on the scene, Carlton turned his focus to Nicklaus. Carlton never told Nicklaus that he - or Ron- was under arrest. When he told Nicklaus to give him his hands to be handcuffed, Nicklaus did not resist. After he was handcuffed, he verbally objected to being pulled by Carlton towards Officer Luedtke and Ron. In response, Carlton threw the handcuffed-Nicklaus to the ground, grabbed him by the neck and pepper sprayed him twice at close range.

While it might be argued before a jury that Carlton was facing an escalating situation, and that this required some action on his part to take Nicklaus out of the picture, that is certainly not the only argument that can be made. Pepper spraying a handcuffed (but not arrested) man in the face while holding him by the neck could also be seen as an overreaction to what previously had been a purely verbal interaction. In other words, it might be equally reasonable to assert that the situation was escalating because of Carlton's conduct and not because of anything Nicklaus (or Ron) had done.

It cannot be determined at this time that the force used by Carlton on Nicklaus was reasonable under the circumstances when those circumstances are viewed from Nicklaus' vantage. Accordingly,

Carlton's motion for summary judgment as to Nicklaus' Fourth Amendment claim (Count III) is DENIED.

The situation confronted by Luedtke was somewhat different. Before Luedtke arrived, Ron had not been told he was under arrest by Carlton; he was simply backing away from a police officer who wanted to talk to him. But when Luedtke arrived, he was told by Carlton that Ron was being charged with resisting arrest. It was only at that time that Ron was informed - by Luedtke - that he was under arrest. Any force used by Luedtke had to be reasonable under the circumstances to effect that arrest.

So what were the circumstances faced by Luedtke? There is no dispute that Ron was intoxicated. There is also no dispute that, by this time, he was belligerent and completely uncooperative. He was yelling at Luedtke, using profanity, and backing away. Based on what he was told by Carlton, Luedtke advised a decidedly-intoxicated Ron that he was under arrest. Nothing that Ron did subsequently negated Luedtke's belief that Ron had been resisting or was continuing to resist arrest. When Luedtke told Ron he was under arrest, Luedtke grabbed Ron's wrist and told him to give him his hands to be handcuffed. Ron refused and continued to resist, trying to pull away. Luedtke held on to Ron's arm, and a third officer who had arrived on the scene assisted Luedtke. The two officers pushed Ron against the garage, took him down to the ground, put a knee in his back and handcuffed him.

Luedtke, a latecomer to the situation, cannot be blamed for the escalation of circumstances. Even if Carlton exercised poor judgment in the way he handled his initial encounter with Ron and the others, by the time Luedtke arrived, the situation was already getting out of hand. He used no more physical force than was necessary to effect an arrest of a drunken, belligerent, and resisting Ron Dreyer.

The cases cited by the Defendants are not to the contrary. For those cases to control, the Court would have to view the facts from the vantage of the Defendants. For example, in <u>Brooks v. City of Aurora</u>, 653 F.3d 478 (7th Cir. 2011), an officer arrived with a warrant for the arrest of Brooks on a traffic violation. Brooks "backpedaled" away from the officer and tried to avoid the officer's grasp of his wrist. The officer then sprayed his face with pepper spray twice. In addition to the original charge, he was also arrested for resisting a peace officer in the performance of his duties. He was acquitted of both charges. Unlike <u>Brooks</u>, when Carlton arrived on the scene, he had no arrest warrant, no probable cause for arrest, and no indication that Ron had done anything wrong. In addition, it was Nicklaus, not Ron, who bore the brunt of the force exerted by Carlton. Nicklaus never resisted. He verbally objected - after being handcuffed - to Carlton's conduct. The factual distinctions make <u>Brooks</u> inapposite to the case at bar.

In <u>Bell v. Irwin</u>, 321 F.3d 637 (7th Cir. 2003), police officers used bean-bag rounds during a stand-off that occurred when a drunk and armed suspect in a domestic battery case refused to come out of his home. He threatened to kill himself and anyone who tried to enter, and to blow up the house. An officer opened the door and fired four rounds. One of them hit him in the head, injuring him. That the Seventh Circuit found the use of force commensurate to the circumstances is really not surprising. Those circumstances are so much more extreme and dangerous than the ones presented to Carlton in the case at bar that the discussion provides no significant guidance.

In <u>Sow v. Fortville Police Dept.</u>, 636 F.3d 293 (7th Cir. 2011), plaintiff was shoved as he was being placed into a squad car following his arrest for forgery. The Court stated the maxim that "not every push or shove, even if it may later seem unnecessary... violates the Fourth Amendment." <u>Id.</u> at 304. The force used by Carlton as he reacted to Nicklaus' words was clearly more significant that a simple shove. Once again, the case is not apposite.

The other out-of-Circuit cases cited deal with the types of take-downs used by Luedtke on Ron. They have nothing factually to do with the force used by Carlton against Nicklaus.

For all of these reasons, Carlton's motion for summary judgment as to Count III is DENIED.

***QUALIFIED IMMUNITY***

Defendants go on to assert that, even if their conduct may have violated the Fourth Amendment, they are entitled to qualified immunity. Because I found no Fourth Amendment liability on the part of Officer Luedtke, the following discussion only concerns Officer Carlton.

The doctrine of qualified immunity insulates government actors from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925-26 (7th Cir. 2011), citing Pearson v. Callahan, 555 U.S. 223 (2009). See also, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine protects public officials "who act in ways they reasonably believe to be lawful," and thus leaves "ample room for mistaken judgments." Wheeler v. Lawson, 539 F.3d 629, 639 (7th Cir.2008) (citations omitted).

Qualified immunity defenses present two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194 (2001). Saucier was recently modified to make clear that courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223 (2009). The burden is on the Plaintiff to overcome a qualified immunity defense. Catlin v. City of Wheaton, 574 F.3d 361, 365 (7th Cir. 2009).

A seizure for purposes of the Fourth Amendment is unreasonable if it is accomplished through the use of excessive force. Gonzalez v. City of Elgin, 578 F.3d 526, 540-41 (7th Cir. 2009), citing Los Angeles County, California v. Rettele, 550 U.S. 609, 614 (2007) ("Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time."); Graham, 490 U.S. at 394. Nicklaus Dreyer has described such a seizure, and so it is the second inquiry under Pearson and Saucier that is considered: was this right clearly established at the time that Carlton acted, assessing the officers' action in light of the particular circumstances facing them, but accepting the Plaintiffs' account of those circumstances.

At the time of the situation described by Nicklaus Dreyer, it was clearly established that a police officer may not, without provocation, pepper-spray, grab a person by the throat, or throw a handcuffed person to the ground. While it is certainly arguable that there was provocation, the facts about that provocation are disputed, as is the officer's response thereto.

Taking Nicklaus' version of facts as true, Carlton is not entitled to qualified immunity. Naturally, the trier of fact is not obligated to accept the Plaintiffs' version of facts; if the jury accepts the Defendant's account of the evening, he may still prevail on the merits. At this time, however, the motion seeking qualified immunity for Officer Carlton is DENIED.

### *STATE CLAIMS*

The Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Act"), provides, "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. "Willful and wanton conduct" is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.

Defendants conclude that "[t]he same facts that establish that there was no Fourth Amendment violation establish that the officers are entitled to immunity on the state law claims." This is certainly true as to the claim against Luedtke; even taking the Plaintiffs' version of facts as true, there was nothing about Luedtke's conduct that demonstrated or indicated an intent to harm Ron or an utter indifference to his safety. He used force, but the force was reasonable under the circumstances, so it cannot have been willful and wanton.

The argument is flawed, however, as to Carlton. Questions of fact abound as to whether the force he used was reasonable. If a jury were to accept Nicklaus' version of the facts, it would not be a far stretch for the jury also to conclude that Carlton's conduct rose to the level required by the statute to constitute willful and wanton misconduct.

Even if one looks at the substance of Carlton's argument rather than just the conclusion, the outcome is the same. He asserts that his actions could not possibly meet the statutory standard of "willful and wanton" because those actions "were taken in response to ... Nicklaus Dreyer's decision to intervene..." Hence, according to Carlton, he neither intended to cause harm nor acted in disregard of Nicklaus Dreyer's safety. Assuming the accuracy of Nicklaus' version of the facts, that statement does not meet the "straight face" test. If a verbal intervention justifies the level of force used, then the distinction between "willful and wanton" conduct and other conduct becomes meaningless. Whether Carlton's actions were willful and wanton under the statutory definition is a conclusion that must be drawn from disputed facts, a conclusion that can only be drawn by the jury in this case.

## CONCLUSION

Luedtke's motion for summary judgment as to Ron's Fourth Amendment claim (Count I) is GRANTED. Carlton's motion for summary judgment as to Nicklaus' Fourth Amendment claim (Count III) is DENIED. The motion for summary judgment as to the state law claim against Luedtke

13

(Count II) is GRANTED. The motion for summary judgment as to the state law claim against Carlton IV) is DENIED.

The two claims (Counts III and IV) against Carlton remain set for a final pretrial conference on March 9, 2012, and for trial on April 9, 2012. A proposed final pretrial order, with all attachments, shall be filed no later than March 7, 2012. Any motions in limine shall be filed by March 7, 2012. ENTERED ON March 1, 2012

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE
